

NUMBER 13-07-00345-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

IN THE INTEREST OF J.L.,  A CHILD

On appeal from the County Court at Law No. 5
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez**

The trial court terminated the parent-child relationship between appellant, C.R., and her child, J.L.[1]  In a post-judgment hearing, the trial court determined that appellant's appeal is frivolous under section 263.405(d)(3) of the family code.[2]  Appellant appeals the

---

[1] To protect the privacy of the minor children, we refer to the parties by their initials.  *See* TEX. R. APP. P. 9.8(b)(2); TEX. FAM. CODE ANN. §109.002(d) (Vernon 2008).

[2] *See* TEX. FAM. CODE ANN. § 263.405(d)(3) (Vernon 2008) ("The trial court shall hold a hearing . . . to determine whether . . . the appeal is frivolous as provided by Section 13.003(b), Civil Practices and Remedies Code."); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 13.003(b) (Vernon 2002).

trial court's finding that her appeal is frivolous.  We affirm.

## I. BACKGROUND

On August 18, 2004, the Texas Department of Regulatory and Protective Services (the "Department") filed suit seeking termination of appellant's parental rights to three of her children, including J.L.  J.L.'s two siblings were returned to appellant, and J.L.'s case was severed.[3]  On May 14, 2007, a trial was held, and a jury determined that appellant's parental rights to J.L. should be terminated.  On June 11, 2007, the trial court signed an order terminating appellant's parental rights to J.L.  In its termination decree, the trial court found by clear and convincing evidence that termination was in the child's best interest and that appellant:

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[4]
>
>     . . . .
>
> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[5]
>
>     . . . .
>
> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of [the Department] or an authorized agency for not less than six months, and;

---

[3] During the trial to terminate appellant's parental rights to J.L., Ayesha Reynolds, a caseworker with the Texas Department of Regulatory and Protective Services in Houston, Texas, testified that the Department in Houston had subsequently removed appellant's other two children and placed them with family members. According to Reynolds, the Department's goal in that case is for family adoption.

[4] TEX. FAM. CODE ANN. § 161.001 (1) (D) (Vernon Supp. 2009).

[5] *Id.* § 161.001(1)(E).

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment[6]

. . . .

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing Conservatorship of [the Department] for not less that [sic] nine months as a result of the child's removal from the parent under Chapter 262 [Procedures in Suit by Governmental Entity] for the abuse or neglect of the child.[7]

Appellant filed her statement of points on appeal, and after conducting a hearing pursuant to section 263.405 of the family code, the trial court concluded that appellant's appeal was frivolous under section 13.003(b) of the civil practices and remedies code.[8] In its order, the trial court found that appellant had not presented a substantial question for appellate review, appellant had effective counsel, and by appellant's "own testimony presented evidence clear and convincing to establish all of the statutory grounds for termination offered by [the Department]." The reporter's record of the frivolousness hearing was filed with this Court; however, because the trial court determined that appellant's appeal was frivolous, appellant was not entitled to a free reporter's record of

---

[6] *Id.* § 161.001(1)(N).

[7] *Id.* § 161.001(1)(O).

[8] *See id.* § 263.405(d)(3); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 13.003(b).

3

the termination trial.[9]  Appellant asked this Court to order the filing of the reporter's record

of the termination hearing.   After considering appellant's request, we concluded that we

lacked sufficient evidence to apply the appropriate standards of review to determine

whether appellant's appeal was frivolous and ordered the preparation of a free reporter's

record of the termination hearing, which has been filed with this Court.[10]

## II. FRIVOLOUS FINDING

In order to appeal the termination of parental rights, a parent must file "a statement

of the point or points on which the party intends to appeal."[11]  After a parent has filed her

statement of appellate points, pursuant to section 263.405(d), the trial court is required to

conduct a hearing to determine, among other things, whether the appeal is frivolous as

provided by section 13.003(b) of the civil practices and remedies code.[12]  One statutory

consequence of a frivolousness determination is that the scope of appellate review is

---

[9] When the trial court finds that an appeal is frivolous under section 13.003 of the civil practices and remedies code, an appellant is not entitled to a free reporter's record of that proceeding. *See* TEX. PRAC. & REM. CODE ANN. § 13.003(a)(2)(A) ("[A] court reporter shall provide without cost a statement of facts and a clerk of a court shall prepare a transcript for appealing from the court only if: . . . the trial judge finds [that] the appeal is not frivolous").  However, when the trial court finds an appeal frivolous, pursuant to the family code, an indigent appellant is entitled to a free reporter's record of the frivolousness hearing. *See* TEX. FAM. CODE ANN. § 263.405(g) ("The appellant may appeal . . . the court's finding that the appeal is frivolous by filing with the appellate court the reporter's record and clerk's record of the hearing held under this section, both of which shall be provided without advance payment").

[10] *See In re K.D.*, 202 S.W.3d 860, 866 (Tex. App.–Fort Worth 2006, no pet.) (concluding that "an appellate court has the authority to order the preparation of a free record of all of the evidence in a termination case when necessary to review a trial court's determination that an appeal raising a factual sufficiency complaint is frivolous"); *In re M.R.J.M.*, 193 S.W.3d 670, 676 (Tex. App.–Fort Worth 2006, order) (providing that an appellate court has the authority under the separation of powers clause to order the preparation of all of the evidence in a termination case when necessary to review a trial court's determination that an appeal is frivolous); *see also* TEX. R. APP. P. 34.6(d).

[11] TEX. FAM. CODE ANN. § 263.405(b).

[12] *Id.* § 263.405(d).

4

initially limited to the frivolousness finding.[13]

An appeal is frivolous if there are no substantial questions for appellate review.[14] Furthermore, an appeal is frivolous "when it lacks an arguable basis whether in law or in fact."[15] An appellate court reviews the trial court's determination that an appeal is frivolous under an abuse of discretion standard of review.[16] "The test for abuse of discretion is 'whether the court acted without reference to any guiding rules and principles' or, stated another way, whether its decision was arbitrary or unreasonable."[17]

## A. Legal and Factual Sufficiency[18]

Appellant's first three points of appeal challenge the legal and factual sufficiency of the evidence supporting the termination of her parental rights. The trial court concluded that appellant's points did not present a substantial question for appellate review. On

---

[13] *In re K.D.*, 202 S.W.3d at 865 ("[A] trial court's determination that an appeal is frivolous has two statutory consequences. First under family code section 263.405(g), it limits the scope of appellate review to the trial court's determination that the appeal is frivolous. . . . Second under civil practices and remedies code section 13.003(a)(2)(A), a trial court's frivolousness determination has the consequence of denying an indigent appellant the right to a free clerk's record and reporter's record of the underlying trial.") (internal citation omitted); *see Lumpkin v. Dep't of Family & Protective Servs.*, 260 S.W.3d 524, 526 (Tex. App.–Houston [1st Dist.] 2008, no pet.) (setting out that an appellate court must consider whether appeal is frivolous before proceeding to the merits of an appeal).

[14] Tex. Civ. Prac. & Rem. Code Ann. § 13.003(b) ("In determining whether an appeal is frivolous, a judge may consider whether the appellant has presented a substantial question for appellate review.").

[15] *In re K.D.*, 202 S.W.3d at 866 (quoting *De La Vega v. Taco Cabana, Inc.*, 974 S.W.2d 152, 154 (Tex. App.–San Antonio 1988, no pet.) (internal quotations omitted)).

[16] *Id.*

[17] *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)).

[18] We note that we are limited to the appellate record. However, the trial court took judicial notice of its file and stated that it was considering the evidence presented at the termination trial in determining whether appellant's appeal was frivolous. Therefore, we will also review the trial court's file and the record in the termination trial to decide whether the trial court abused its discretion when it determined that appellant's appeal is frivolous.

appeal, appellant challenges the trial court's determination.

1. Applicable Law

"When the trial court conducts a frivolousness hearing on an appellant's proposed legal and factual sufficiency issues, the trial court should apply the [applicable] standard[s] of review."[19] In reviewing the legal sufficiency of the evidence supporting parental termination, the evidence is viewed in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.[20] In a factual sufficiency review, the court must determine whether, on the entire record, a reasonable trier of fact could have formed a firm belief or conviction that its finding was true by considering whether a reasonable factfinder could not have resolved disputed evidence in favor of its finding.[21]

Therefore, the question in this case is whether the trial court abused its discretion by determining that the evidence was such that a factfinder could reasonably form a firm belief or conviction that appellant violated section 161.001(1) and that termination is in J.L.'s best interest.[22]

2. The Evidence

On May 14-16, 2007, a jury trial on the merits was held. At the trial, the Department

---

[19] *In re K.D.*, 202 S.W.3d at 867-68.

[20] *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re K.D.*, 202 S.W.3d at 867.

[21] *In re J.F.C.*, 96 S.W.3d at 266; *In re K.D.*, 202 S.W.3d at 867.

[22] *See In re K.D.*, 202 S.W.3d at 868; *see also* TEX. FAM. CODE ANN. § 161.001(1) (providing that "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has [violated one of the enumerated statutory grounds] . . . and . . . that termination is in the best interest of the child").

presented the testimony, of among others, John Marez, Tracey McZeal, Dennie Janz, Susan Brezina, appellant, and Trudy Stapleton.[23]

Marez, a supervisor with the Department, testified that, in his former position as an investigator, he received a report of alleged medical neglect regarding J.L. Marez visited appellant's home to assess J.L.'s situation. According to Marez, J.L., who was approximately six months old at the time, was "hooked up to numerous apparatus." Marez stated that J.L had a tracheotomy and that there was a tube that he received medication through—a machine that "help[ed] [J.L.] with his breathing." Marez explained that although J.L. had home nurse providers, appellant was responsible for administering J.L.'s medication when the nurses left her home. The nurses were present with J.L. from 8:00 a.m until 5:00 p.m.[24]

Marez noted that when the nurses left and appellant became responsible for J.L.'s care, appellant failed to administer J.L.'s medication. Marez stated, "[The nurses] would leave medication for overnight treatments and [the medication] would still be there in the same little vial or container. Never opened, never used, so that was obviously a concern as we observed the case throughout [the investigation of four months]." Marez explained that from a month's supply of medication, he observed up to two weeks of unused medication that had expired—medication that J.L. needed that he had not received during that month. Marez stated that it was "obvious" that appellant was not providing the medication to J.L. when she was caring for him. On cross-examination by the attorney ad

---

[23] We note that J.L.'s father testified at the trial on the merits. However, he is not a party to this appeal.

[24] Marez stated that the providers were available for seventy hours a week including weekends; however, he did not know whether appellant took advantage of the weekend care.

litem, Marez testified that appellant, in addition to failing to give J.L. his medication, failed to take J.L. to his doctor's appointments.

According to Marez, the condition of the home was a concern for the Department because J.L. was "fragile" and required specific medical care. Marez stated that J.L. needed a "clean environment," so he discussed the condition of the home with appellant. Marez testified that

> the home was—was in disarray. There was a lot of trash and clutter throughout the home. . . . I discovered that there were more—there was more clutter and more trash in each room, including the room that had [J.L.]. He was hooked up to his equipment . . . there was clutter in that room as well. So, it was very concerning, very alarming, and so I made an assessment based on that, initially.

The Department asked appellant to clean the home, and on a follow-up visit, Marez found that appellant had made some progress at cleaning up; however, "there was still clutter in their home" and based on the fact that nurses cared for J.L during the day, Marez believed that appellant was "not using that time to clean the home, and [was] not really sure what [appellant] was using that time for."[25] Marez stated that during contacts he or other professionals had with the family, the children had not been bathed, the children were wearing dirty clothes, and diapers had not been changed and "were totally soiled and sagging."

Marez testified that, eventually, the Department determined that it would be in J.L.'s best interest if he were removed from appellant's home "because it appeared that the parents were not providing [proper medical care]." According to Marez, the Department

---

[25] Marez testified that appellant and J.L.'s father informed him that he and appellant were not working at the time.

8

was concerned because J.L.'s parents were not providing "proper attention to his medical needs," and the Department was concerned that appellant would not "follow through" with a major surgery J.L. was scheduled to have. Marez testified that although appellant did not take J.L to his doctor's appointments, she did transport him to Houston to visit family members. In Marez's opinion, that act endangered J.L. because appellant transported J.L. "away" from his medical providers.

McZeal, a conservatorship caseworker with the Department, testified that she becomes involved in a case once the child has been removed from the home in order to "try to reunite the child with the family" or provide appropriate placement if the parent-child relationship is terminated. McZeal explained that J.L. is unable to eat any solid foods because he has Pierre Robin Syndrome, which is a malformation of the jaw. J.L. has a tracheotomy and a "G button," which is used to feed J.L. liquids directly into his stomach. According to McZeal, J.L. is unable to chew and even chokes on water. J.L. is unable to move his tongue, which can "obstruct his airway and he can die."

Prior to McZeal's involvement, J.L. was removed from appellant's home (the original removal) and placed in foster care. While in foster care, J.L. received physical therapy, occupational therapy, speech therapy, and was transported by ambulance to his appointments. When McZeal became involved in J.L.'s case in 2005, the trial court had ordered J.L. returned to appellant's home. When J.L. was returned, appellant was supposed to arrange for these services to continue for J.L. However, according to McZeal, appellant never made the appointments, even though the therapy would be provided in appellant's home. McZeal stated, "[A]ll [appellant] needed to do was make the phone call to set it up so [the therapists could] come out to [appellant's] home . . . and there was a 30

day lapse in services because it wasn't done."

McZeal testified that appellant allowed J.L.'s Medicaid to lapse. According to McZeal, she had asked appellant on numerous occasions if she had applied for Medicaid, and appellant insisted she had. McZeal stated that she told appellant that one of the Department's "workers" could help her with the paperwork, but appellant said the application had already been completed. Because of the lapse in J.L.'s Medicaid, a scheduled surgery had to be postponed. Furthermore, when the Medicaid lapsed, the medical supply company threatened to pick up J.L.'s medical equipment. According to McZeal, without that equipment, J.L. would have died. McZeal stated that three different organizations informed her that J.L. was no longer receiving Medicaid. J.L.'s case was transferred to the "Intensive Family Preservation" ("IFP") unit that enables the Department to place caseworkers in the home whenever necessary.[26] Then, according to McZeal, after the IFP worked with appellant for approximately two months, J.L. was removed from appellant's home again (the second removal) due to "home conditions" that were not "conducive to his medical condition."[27]

Once the second removal occurred, the case was returned to McZeal, and J.L. was placed in foster care in Corpus Christi, Texas. J.L. remained in that placement from August 2005 until November 2006.[28] According to McZeal, appellant was allowed weekly

---

[26] McZeal testified that usually caseworkers are only able to visit a home once a month due to the large caseload.

[27] Brezina was J.L.'s caseworker when the case was transferred to the "Intensive Family Preservation" unit.

[28] In November 2006, J.L. was moved from his foster family in Corpus Christi to a home for medically fragile children in Temple, Texas.

visitation with J.L. while he was in foster care; however, appellant was not able to make her visitation for many reasons. McZeal stated that appellant had transportation issues, and if she was able to visit by bus from Robstown, Texas, she was thirty to forty-five minutes late. In December 2005, appellant moved from the Corpus Christi area to Houston. McZeal testified that appellant informed her that appellant was going to Houston for the holidays; however, appellant did not return from Houston. McZeal thought that "something may have occurred between [appellant] and [J.L.'s father] that caused her not to return." According to McZeal, she discovered that appellant had moved to Houston when a "CASA" worker informed her that appellant had been evicted from her home.[29] Subsequently, McZeal received a phone call from appellant informing her of appellant's move to Houston.

McZeal stated that, according to the family plan, appellant was required to: (1) attend twelve sessions of parenting classes to be conducted in her home; (2) attend counseling sessions to be conducted in her home; (3) attend regular visitation; and (4) ensure that there was a stable and clean home environment for J.L. The trial court also ordered appellant to pay monthly child support payments for J.L. Appellant only attended two sessions of parenting classes and counseling; on the third session, when the parenting teacher arrived at appellant's home, appellant had gone to Houston. According to McZeal, from August 2005 until December 2005, appellant visited J.L. "very few times," and from December 2005 until May 2007, appellant visited J.L twice. On cross-examination by appellant's counsel, McZeal was asked how a parent who has transportation and financial problems "is supposed to visit their child." McZeal responded that in this case, appellant

---

[29] A "CASA" is a court appointed special advocate.

11

had been cashing J.L.'s monthly social security disability checks for the last "two and a half years" and that appellant could have used those funds to visit J.L.[30]

According to McZeal, the parenting plan required a clean environment for J.L. because of his medical conditions. McZeal stated, "[J.L.] has respiratory problems. Also, since he's not allowed to have anything by mouth, then it becomes a problem because we had a toddler at the time that was able to grasp things and put it in his mouth, and anything that goes in his mouth could kill him." As part of keeping the environment clean for J.L., appellant was asked to remove her cat and kittens from the home. According to McZeal, cat fur had become "trapped in [J.L.'s medical] machines, and that could go into his system and cause problems, infections and choking." Appellant failed to remove the cats from her home. On cross-examination by appellant's counsel, McZeal repeated that cat hair "got into" J.L.'s medical machine and that there was "all kinds of debris; roaches, cat hair, things like that in [J.L.'s] medical equipment."

McZeal testified that at one visitation in May 2006, J.L. ate a "Cheeto" from appellant's purse and began choking. Jantz, J.L.'s foster parent, described the event in detail. Jantz stated that the nurses took J.L., who was coughing, into a room to perform a procedure to remove something from J.L.'s lungs. According to Jantz, the nurses suctioned orange fluid with "chunks that appeared to be Cheetos" from J.L.'s lungs. Jantz testified that it was determined that J.L. had acquired a bag of Cheetos from appellant during the visit. According to Jantz, the situation was extremely dangerous because J.L.

---

[30] McZeal testified that she gave appellant money to buy a bus ticket from Houston to Corpus on two occasions and that the Department has programs to assist parents having financial problems.

could have stopped breathing and died due to aspiration.[31] Jantz testified that he always emphasized that appellant should not allow J.L. to eat or drink anything because it was dangerous; however, Jantz suspected that on other visitations, appellant gave J.L. a drink of "whatever the other kids were drinking."

Jantz explained that J.L. had several items of medical equipment including: (1) a machine that provided a mist to J.L.'s tracheotomy at night; (2) a suction machine; and (3) a machine that vibrates J.L.'s lungs to loosen secretions. J.L. was given medication three times daily.[32] Jantz stated that they used the suction machine in combination with saline "bullets" twelve times daily. If they did not provide the necessary suctioning to J.L.'s lungs, he could have stopped breathing or acquired an infection from the secretions in his lungs. Jantz stated that when J.L. was placed in Jantz's care, J.L.'s condition was "poor," J.L. and his equipment were dirty, and J.L. "hadn't been taken care of." According to Jantz, after his wife suctioned J.L.'s lungs for the first time, they found a cockroach in the tubing. Jantz stated that they then took all of the equipment outside and while cleaning the equipment, found "roaches."

Brezina, a member of the Department's IFP unit, testified that when she became involved in J.L.'s case, the Department believed that there was "some imminent danger" to J.L. Brezina stated:

> Well, going into the case, there was [sic] some preexisting problems. There had been police for domestic violence, there had been police because there [sic] five year old was left home alone without any adult supervision, so that's

---

[31] Jantz, a licensed vocational nurse, stated, "Aspirating is when you suck a material into your lungs. That's what we refer to as aspirating, and [J.L.] had aspirated the Cheetos into his lungs."

[32] Jantz testified that J.L required three nebulizer treatments per day and had to be fed every four hours through his "G-button." J.L. had appointments with doctors six times per month.

13

of course a concern when you are dealing with a medically fragile infant with that kind of bad choices by the parents. Then there was the issue of little [J.L.]. He needed both jaw surgery and eye surgery, and neither of them were taking place. . . . [T]he surgery was scheduled for July, and [appellant] let her Medicaid lapse. . . . So, [the Department] had— first of all, had to get her Medicaid reinstated which I explained to [appellant] . . . is a free government service. This is inappropriate that you let the Medicaid lapse on a medically fragile child. Then there was the issue of medications. Once I got the case—What I do, is I check the medications, and they had a home health nurse. . . . The first thing I did was check the medications with the nurse's log, and the dates, and one of the medications had expired and was two-thirds full. And the other medications, when I checked the milligrams, that they corresponded with the nurses' log, when [the nurses] gave the medications, but there was no medication given outside that. There's—you know, there is way too much medication in those bottles, and I explained to [appellant] that he had to be on this medication, that it was very important.

And then in talking with the doctor's office for the eye surgery, I ended up setting up the appointments, and they were very frustrated, and—and [appellant] was inconsistent with her appointments . . . she missed appointments, she wouldn't reschedule appointments.

According to Brezina, she finally made the doctors' appointments for J.L. because appellant failed to do it, and Brezina made sure that J.L. was at his appointments, which she attended. Brezina stated that J.L. was required to wear his glasses at all times except when sleeping or swimming and was supposed to wear an eye patch at least four hours per day so that his eye surgery would be successful. However, Brezina discovered that appellant had not purchased any eye patches for J.L. and did not make J.L. wear his glasses, which appellant had difficulty finding.

According to Brezina, the "roach problem" was "overwhelming" because when she visited appellant's home, the cockroaches were crawling over her feet and it was a "massive infestation." When J.L. was on the floor, the cockroaches were crawling on his hands and then he would touch his tracheotomy. Brezina testified that when she removed J.L.'s medical equipment from appellant's home, cockroaches crawled out of his "breathing

14

machine" that had been connected to his tracheotomy. Brezina stated that she explained to appellant that roaches carry diseases and germs and that she needed to scrub the "filthy" floor once a day. Brezina also observed that J.L.'s diaper was "never" changed and that the diaper was "sopping wet and hanging on him." Brezina stated that the safety plan required appellant to remove the cats from her home because cat fur had been found in J.L.'s medical equipment; however, when Brezina made unannounced visits, she found the cats inside appellant's home. On cross-examination by the attorney ad litem, Brezina testified that she believed that J.L. was in imminent danger due to the condition of appellant's home and appellant's inability to provide J.L.'s daily medical care, including keeping medical appointments.

Appellant testified that she has lived in Houston for approximately one year and has three children, including J.L., who was four years old at the time of trial. Appellant stated that since she moved to Houston, she has visited J.L. four or five times, but she did not know the exact dates; the last time she saw J.L. was "before November" of 2006.[33] J.L. was moved to Temple, Texas, and according to appellant, she has not visited him in Temple because she does not know how to get there. Appellant admitted that she had been receiving J.L.'s social security check and cashing it to cover her expenses to and from her court appointments in Corpus Christi. Appellant was receiving five hundred twenty-one dollars per month for J.L. after he had been removed from her home. Appellant did not recall when she stopped receiving J.L.'s social security checks, but thought the checks stopped sometime in 2006. Appellant acknowledged that the money did not belong

---

[33] The termination trial was conducted in May 2007.

to her and admitted that she spent it on her other children and on her travels to Corpus Christi.

Appellant was not aware of when J.L. had been removed from her home and claimed that the Department did not give her a reason for J.L.'s removal; however, she also stated that she believed that Marez removed J.L. from her care because he thought that "she was gonna run with him." According to appellant, her home was "cluttered" because she had moved from one apartment unit to another. Appellant also did not recall whether the Department had given her a list of things she needed to do in order to have J.L. returned to her. She also did not remember receiving a "Family Plan of Service" from the Department. When counsel for the Department showed appellant a copy of the "Family Plan of Service" with her signature, appellant recalled that it was the "stuff" that she was required to do in order for her children to be returned to her. Appellant explained that the "Family Plan of Service" required that she provide a "safe environment" for her children and for her to attend parenting class and counseling. Appellant stated that she was required to attend twelve parenting classes, but she only completed five sessions. She explained that she did not complete the counseling because her counselor stopped visiting her. Appellant claimed that she was not aware of how much child support she was required to pay. However, after reviewing the "Family Plan of Service," appellant agreed that the court ordered her to pay five dollars per month, and she admitted she did not pay any child support.

Appellant stated that she was not told that the cat needed to be removed and that the cat was not a problem because it stayed in the living room and J.L. never left his bedroom. Appellant testified that she had a pest problem because she lived next to a field

16

and that "everyone was having problems with roaches and rats." However, appellant insisted that when Jantz received J.L.'s medical equipment, it was clean and new. According to appellant, when J.L. ate a Cheeto from her purse, he was fine when he left, and appellant did not "know where [Jantz was] saying that [J.L.] had choked" because after he ate the Cheeto, "he started playing and he was doing fine, doing normal stuff, like a normal child, just playing, doing everything." Appellant explained that J.L.'s surgery was not postponed because the Medicaid lapsed but because the doctor did not perform surgeries on Tuesdays and had to reschedule.

Appellant was unable to explain J.L.'s medical condition and did not know what medications he was required to take or the amount he needed. On cross-examination by the attorney ad litem, appellant agreed that she was overwhelmed with J.L. and that she may have missed "a couple nebulizer treatments," and possibly had not given him his medication at night. The attorney ad litem asked appellant if it was healthy for J.L. to be confined to his bedroom, and she replied, "No, but [a nurse] said I had to keep him in the room, he couldn't come out in the living room where we were, he had to stay back there with the nurses, where all of the machines were."[34]

Stapleton, the CASA for J.L., testified that in her opinion, it is in J.L.'s best interest for appellant's parental rights to J.L. be terminated because she would "fear for his life" if he were returned to appellant. On cross-examination by the attorney ad litem, Stapleton stated that J.L.'s current foster parents were "willing to keep him permanently" and in her opinion, this environment would be conducive to his physical health. According to

---

[34] Jantz testified that J.L. was an active child and played outside like any other child would.

Stapleton, J.L. appeared to be "thriving," and his foster parents provided the medical care that J.L. needs.

The jury was instructed that it could terminate appellant's parental rights if it found by clear and convincing evidence that appellant had violated one of four statutory grounds alleged. The evidence showed that appellant: (1) failed to provide adequate medical care for J.L. and allowed him to remain in a home that was dangerous to his physical health; (2) failed to visit J.L. or maintain contact with J.L. while he was in the Department's conservatorship; and (3) failed to comply with the court order to pay child support and attend parenting classes. Based on our review of the record, we conclude that the evidence is such that the jury as factfinder could have reasonably formed a firm belief or conviction that appellant violated one or more of the alleged statutory grounds and that termination of appellant's parental rights was in J.L.'s best interest.[35] Therefore, the trial court did not abuse its discretion by determining that appellant's appeal was frivolous as to her legal and factual sufficiency complaints.

## B. Ineffective Assistance of Counsel

In her final point on appeal, appellant claimed that trial counsel rendered ineffective assistance. However, because our review is limited to the frivolous determination,[36] the issue is whether the trial court abused its discretion by determining that appellant's ineffective assistance claim is frivolous.

A claim of ineffective assistance of counsel is established if the appellant shows that

---

[35] *See In re S.T.*, 263 S.W.3d 394, 402-03 (Tex. App.–Waco 2008, pet. denied) ("For termination of the parent-child relationship, the factfinder must make an affirmative finding: (1) on at least one predicate ground for termination; and (2) that termination is in the best interest of the child.").

[36] *See In re K.D.*, 202 S.W.3d at 867; *see also In re S.T.*, 263 S.W.3d at 400.

18

counsel's performance was deficient and the appellant was prejudiced by counsel's performance.[37] There is a strong presumption that counsel rendered reasonably professional assistance.[38] Therefore, appellant must establish by a preponderance of the evidence that counsel's performance fell below an objective standard of prevailing professional norms and that there is a reasonable probability that but for counsel's deficiency, the result of the proceeding would have been different.[39]

An allegation of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.[40] If the record is silent regarding the basis of an ineffective assistance complaint, an appellate court may not speculate on the reason for counsel's act or omission.[41]

Appellant complains that trial counsel failed to object to the Department's failure to file a witness list. At the frivolousness hearing, appellant presented no evidence supporting her assertion that trial counsel rendered ineffective assistance, including testimony from her trial counsel concerning the reason for his alleged omission.

Appellant has the burden of rebutting the presumption that trial counsel's actions and decisions were reasonably professional and motivated by sound trial strategy.[42]

---

[37] *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006) (per curiam).

[38] *Id.*

[39] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

[40] *In re K.K.*, 180 S.W.3d 681, 685 (Tex. App.–Waco 2005, no pet.) (per curiam).

[41] *In re K.M.H.*, 181 S.W.3d 1, 7 n.1 (Tex. App.–Houston [14th Dist.] 2005, no pet.) ("Where the record is silent regarding counsel's strategy or tactics, we will not speculate as to the basis for counsel's decision.") (citing *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994)).

[42] *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'").

Absent evidence in which trial counsel explains his actions, our assessment of counsel's strategy would call for impermissible speculation.[43] Appellant has not rebutted the strong presumption that trial counsel rendered reasonably professional assistance.[44] There is nothing in the record to show that trial counsel was not motivated by sound trial strategy. Furthermore, trial counsel did object to one of the Department's witnesses, arguing that the witness was a surprise; as a result, that witness did not testify. Because the record does not affirmatively demonstrate that counsel's overall performance was deficient, we do not reach the prejudice prong of the *Strickland* test.[45] Therefore, we conclude that the trial court did not abuse its discretion in determining that appellant's appeal was frivolous as to her ineffective assistance of counsel complaint.

### III. CONCLUSION

We affirm.

LINDA R. YAÑEZ
Justice

Delivered and filed
the 4th day of March, 2010.

---

[43] *See In re K.M.H.*, 181 S.W.3d at 7 n.1.

[44] *See In re H.R.M.*, 209 S.W.3d at 111.

[45] *See Strickland*, 466 U.S. at 694.